UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SKI LIFTS, INC., a Washington corporation, | CASE NO. C19-0062-JCC |
| Plaintiff, | ORDER |
| v. | |
| SCHAEFFER MANUFACTURING CO., a Missouri corporation, | |
| Defendant. | |

This matter comes before the Court on Defendant's motion for summary judgment and for sanctions (Dkt. No. 28). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I.  BACKGROUND

Plaintiff owns and operates the Summit at Snoqualmie ski resort. (Dkt. Nos. 25 at 2, 28 at 6.) Plaintiff uses "snowcats," manufactured by Bombardier, Bombardier's successor company Prinoth, and Kasshober to groom its ski areas. (Dkt. Nos. 25 at 2, 28 at 11; *see, e.g.*, Dkt. No. 30 at 13–14, 41, 106.) Prior to 2012, Plaintiff used many different hydraulic fluids in its snowcats, including one called AW 46. (Dkt. No. 30 at 4, 43–44, 46.) Lucas Spurgeon, Plaintiff's grooming shop manager and Rule 30(b)(6) designee in this case, stated that he was "not a hydraulic

specialist" and did not know "what classifications hydraulic AW 46 falls underneath." (*Id*. at 44.) Defendant's expert opines that AW 46 hydraulic fluid was outside the specifications of several of Plaintiff's snowcats and therefore may have caused the damage to the snowcats at issue in this case. (*See* Dkt. Nos. 29 at 26, 33, 37, 40–41, 52–53, 57; 30 at 43.)

In 2012, Spurgeon suggested standardizing the snowcats' hydraulic fluid. (Dkt. No. 30 at 45–46.) Spurgeon called Prinoth's head of service, who recommended using Type F hydraulic fluid in the snowcats, although other types of hydraulic fluids could be used as well. (*Id*. at 9–10.) The snowcats' maintenance manuals indicated that at least one type of snowcat was compatible with both Type F and Type A hydraulic fluid. (*See id*. at 12–14, 65–92.)

Sometime between 2012 and 2013, Spurgeon contacted Mark Booth, a sales representative employed by Defendant, about switching Plaintiffs' snowcats to a new hydraulic fluid. (*Id*. at 47–48.) While Spurgeon initially stated that he wanted to "go towards the ATF Type F side," Booth "showed [Spurgeon] that ATF Type F was outdated and [that Defendant's hydraulic fluid] All-Trans superseded anything and everything that Type F could ever bring to the table." (*Id*. at 48.) Booth provided Spurgeon a copy of the technical data sheet for All-Trans, which stated, "All-Trans Supreme is not recommended for the use in those passenger cars, light-duty trucks that specify the use of . . . Ford Type F . . . fluids." (*See id*. at 53.)[1]

In the summer of 2014, Plaintiff began using All-Trans in its snowcats. (*Id*. at 11.) On December 20, 2015, one of Plaintiff's snowcats "showed signs of powertrain problems," including low power and an inability to go forward, backward, or turn left or right. (*Id*. at 34–35,

---

[1] During his deposition, Spurgeon stated that he did not have a copy of the All-Trans technical data sheet Booth provided in 2012 or 2013 and instead reviewed a revised March 2017 copy. (Dkt. No. 30 at 52–53.) Spurgeon asserted that had the technical data sheet Booth had given him contained the same information as the revised 2017 copy, Spurgeon would not have purchased All-Trans. (*Id*. at 53.) But Karen Wright, Defendant's technical director and regulatory specialist, states that she has reviewed all All-Trans technical data sheets produced since 2007 and that "[t]here are not any versions that fail to disclose that All Trans is not a Type F product." (Dkt. No. 19 at 2.)

39.) By March 31, 2016, nine of Plaintiff's snowcats "had gone down or had shown the same symptoms as the original cat that went down." (*Id*. at 39.) While all of Plaintiff's snowcats used All-Trans, those manufactured by KassBohrer did not show signs of diminished performance. (*Id*. at 40–41.)

In January 2016, Plaintiff began to suspect that All-Trans was causing the snowcats' problems. (*See id*. at 54.) To investigate, Plaintiff first examined the snowcats' engines but did not find any issues. (*Id*. at 37.) Plaintiff then checked the snowcats' hydraulic systems by warming up the hydraulic fluid, checking the system pressures against the manufacturer specifications, and blocking off the motors to determine "that the pump itself was actually failed and not the motor itself that had gone bad." (*Id*. at 37–38.)[2] Ultimately, Plaintiff concluded that All-Trans was causing the issues with the hydraulic system because All-Trans "was the only variable that had happened in the last three seasons" and because of how quickly the nine snowcats failed one after another. (*See id*. at 37–40, 54–55.) Plaintiff acknowledges that hydraulic pumps can be damaged in many ways, including heat, operator error, manufacturing flaws, and low hydraulic fluid levels; however, Plaintiff did not investigate other potential causes of the hydraulic pump issues after concluding that All-Trans was "a possible cause." (*See id*. at 49–51.)

Plaintiff gathered the pumps and hydraulic motors allegedly damaged by All-Trans in a storage bin. (*Id*. at 26, 28, 30–31; *see id*. at 32) ("It was strictly pumps and motors from the cats that we were doing pumps and motors in that summer and . . . [t]he '14-'15 season or '15-'16 season."). Plaintiff asserts that the storage bin did not contain "any old parts from machines that were not affected by All-Trans" but acknowledges that the bin was not in a locked room or

---

[2] When asked what "blocking off the motor" entailed, Spurgeon stated that "the two high-pressure hoses that go from the pump to the motor share a path . . . . If you block that path off, there's no fluid loss that you can get out of the motor . . . . So if you block those ports off and stoke the pump and the pump doesn't come to full pressure, that means the pump can't produce pressure." (Dkt. No. 30 at 38.)

ORDER
C19-0062-JCC
PAGE - 3

otherwise limited in terms of physical access. (*Id*. at 32.) The parts were initially tagged to identify which snowcat they were taken from, but the tags were eventually discarded or otherwise lost. (*Id*. at 26.) Plaintiff asserts that it tested at least some of the parts to determine the cause of the damage but is unable to locate records of that testing. (*See id*. at 19.) Plaintiff also cannot locate records of pump replacements done on the affected snowcats prior to 2016 or of the number of hours the damaged pumps and motors had been used before being replaced. (*See id*. at 24–25, 29–31.)

In April 2016, Booth and Larry Ludwig, a chemist employed by Defendant, visited Plaintiff's grooming shop and met with Spurgeon. (Dkt. No. 35 at 5.) Plaintiff states that it "had all of the damaged pumps there in [its] shop and available for inspection." (*Id*. at 5–6.) Plaintiff provided one damaged hydraulic pump to Booth; no other parts were given to Defendant or available when Defendant deposed Spurgeon. (*Id*.; Dkt. No. 30 at 26–27, 33–34.)[3] When asked if he knew if the hydraulic pump given to Booth was a left- or right-hand pump, Spurgeon responded that he would "have to look at the pictures, but right offhand I don't know if it was left or right. I could tell by pictures, but I don't think I have those pictures here." (Dkt. No. 30 at 33–34.) Plaintiff states that Booth and Ludwig "made no mention of [Plaintiff] retaining the other damaged pumps so they could be inspected." (Dkt. No. 35 at 6; *see* Dkt. No. 35 at 6) ("We were never informed by Schaeffer or its insurer to retain the pumps or that they wished to further inspect them."). Plaintiff kept the remaining parts "for at least two years"; around 2018, Plaintiff sent nearly all of the parts to be scrapped. (Dkt. No. 30 at 18–19, 26, 33–34.)[4]

On June 20, 2016, Plaintiff sent Defendant a bill for Plaintiff's costs to replace motors and pumps allegedly damaged by All-Trans. (*See id*. at 110.) By September 15, 2016, Plaintiff

---

[3] During his deposition, Ludwig stated that to his knowledge Defendant did not inspect or test the partial pump Defendant received from Plaintiff. (*See* Dkt. No. 39-1 at 3–4.)

[4] Plaintiff states that it recycled the damaged pumps and motors in the normal course of business, as Plaintiff operates on U.S. Forest Service land and thus must comply with strict environmental regulations. (*See* Dkt. Nos. 35 at 6, 38 at 5.)

had filed a claim for the damage to the snowcats with AIG Specialty Lines Insurance Company, Defendant's insurer. (*See id.* at 111.) Plaintiff completely stopped using All-Trans in its snowcats by January 2018. (*Id.* at 55, 57.)

Defendant asserts that in 2016, Plaintiff told Defendant that the snowcats were only compatible with Type F hydraulic fluid, despite knowing that the snowcats could use other types of hydraulic fluids. (*See* Dkt. Nos. 28 at 8; 30 at 95–96, 99–100, 104, 106.) Defendant states that, based on Plaintiff's representation, Defendant initially concluded that All-Trans was incompatible with the snowcats. (*See* Dkt. No. 30 at 101–02.) Accordingly, Defendant told Plaintiff that All-Trans was incompatible with Plaintiff's snowcats and that Defendant's insurer would compensate Plaintiff for Plaintiff's losses. (*See* Dkt. No. 45 at 2–3.) But Defendant later found that the snowcats' manuals show that "Type A is on the acceptable list for [the snowcats]. And [All Trans] meets or exceeds the specifications for Type A; therefore, [All Trans] could not have been the incorrect fluid for that equipment." (Dkt. No. 30 at 101–02.) Defendant's expert opines that All-Trans "is advertised to be suitable for use in applications where" Type A hydraulic fluid is specified, is superior in quality to Type F hydraulic fluid, and it was therefore compatible with Plaintiff's snowcats. (Dkt. No. 29 at 29–30, 57.) Defendant's expert further opines that the snowcats' technical data sheets' warning about using All-Trans in vehicles using Type F hydraulic fluid "is not directly applicable to snow cat applications" because the snowcats are not passenger cars or light duty trucks. (*See id.* at 29.) Defendant's expert's report also describes hydraulic issues suffered by the snowcats both before and after Plaintiff used All-Trans in its snowcats. (*See id.* at 32–45.)

On December 18, 2018, Plaintiff filed in King County Superior Court a complaint asserting claims for breach of express warranty in violation of Washington's Product Liability Act ("WPLA"), Wash. Rev. Code §§ 7.72 *et seq.*; breach of express warranty in violation of the Uniform Commercial Code ("UCC"), Wash. Rev. Code § 62a *et seq.*; and negligence against Defendant. (*See* Dkt. No. 1 at 8–14.) Defendant removed the case on January 14, 2019. (*Id.* at 1–

5.) On December 18, 2019, the Court granted Plaintiff leave to amend its complaint to assert a claim arising under Washington's Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86 *et seq*. (Dkt. No. 24; *see also* Dkt. No. 25.) Defendant now moves for dismissal of Plaintiff's claims, arguing that Plaintiff's spoliation of evidence merits dismissal and that Plaintiff cannot establish proximate causation. (Dkt. No. 28.)

## II. DISCUSSION

### A. Spoliation

#### 1. *Plaintiff's Spoliation of Relevant Evidence*

In evaluating Defendant's spoliation claim, the Court first looks to whether Plaintiff spoliated relevant evidence when it sent the pumps and motors allegedly damaged by All-Trans to be scrapped. District courts possess inherent authority to impose sanctions against a party in response to the party's spoliation of relevant evidence. *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009). The party alleging spoliation must prove:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;' and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (collecting cases).

"[T]he 'duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation.'" *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (quoting *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800 (N.D. Tex. 2011)). "Stated differently, the duty to preserve is triggered not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation." *Id*. (internal quotations omitted); *accord*

*Henderson v. Tyrell*, 910 P.2d 522, 534 n.7 (Wash. Ct. App. 1996) (quoting *Fire Ins. Exch. v. Zenith Radio Corp.*, 747 P.2d 911, 913–14 (Nev. 1987)) ("[E]ven where an action has not been commenced and there is only a potential for litigation, the litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action.").

In the Ninth Circuit, a court may impose sanctions on a party for spoliating evidence if the court finds that the party acted with "conscious disregard" of its discovery obligations; generally, a finding of bad faith is not required. *See Apple Inc.*, 888 F. Supp. 2d at 998 (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 n.2 (9th Cir. 1992)); *Hamilton v. Signature Flight Support Corp.*, 2005 WL 3481423, slip op. at 7 (N.D. Cal. 2005) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108) ("[The culpable state of mind] factor is satisfied by showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'").

Here, Plaintiff had sole control over the affected pumps and motors (with the exception of the partial and unidentifiable pump it provided to Defendant), as the parts were kept in Plaintiff's grooming shop from the time they broke down to the time Plaintiff sent them to be scrapped. (*See* Dkt. No. 30 at 18–19, 26, 28, 30–34.) And these parts were not simply relevant to Plaintiff's claims in this case. Rather, they are the crux of Plaintiff's claims against Defendant and critical to Defendant's opposition: each of Plaintiff's claims require the jury to determine whether All-Trans did not conform to Defendant's alleged representation and that All-Trans damaged the affected parts and motors. (*See* Dkt. No. 25 at 3–5.)

Plaintiff should reasonably have known of the parts' relevance to any future claims as early as 2016, when it sent Defendant a bill of costs in June and filed a claim with Defendant's insurance company in September. (*See* Dkt. No. 30 at 110–11.) In particular, Plaintiff's vigorous pursuit of its claim with Defendant's insurance company emphasizes that Plaintiff should have been aware that any future claim for damages against Defendant would be premised on All-Trans' alleged damage to the parts. (*See* Dkt. No. 28 at 16–17.) Therefore, Plaintiff was under a

duty to preserve the pumps and motors when it sent them to be scrapped. *See Surowiec*, 790 F. Supp. 2d at 1005; *accord Henderson*, 910 P.2d at 534 n.7.

Given Plaintiff's awareness that the pumps and motors would be relevant to any future claim for damages against Defendant, Plaintiff acted with "conscious disregard" of its discovery obligations when it knowingly sent the parts to be scrapped. *See Apple Inc.*, 888 F. Supp. 2d at 998; *Hamilton*, 2005 WL 3481423, slip op. at 7. This is especially true where Plaintiff likely sent the parts to be scrapped while its claim with Defendant's insurance company remained ongoing and shortly before filing its complaint in this action. (*See* Dkt. Nos. 1 at 8; 28 at 16; 30 at 18–19, 26, 33–34, 111.)

Plaintiff disputes whether the damaged pumps and motors "are important or relevant," arguing that Defendant did not take its opportunity to inspect the items when Ludwig and Booth visited Plaintiff in April 2016 and that Defendant has not meaningfully inspected the partial pump in its possession. (*See* Dkt. No. 38 at 6–7.) Plaintiff understandably does not cite legal authority in support of its position, as Plaintiff's argument impermissibly attempts to shift its duty to preserve evidence onto Defendant in the form of a duty to inspect potentially relevant evidence before litigation has commenced. *See Surowiec*, 790 F. Supp. 2d at 1005; *Erlandson v. Ford Motor Co.*, 2009 WL 3672898, slip op. at 5 (D. Or. 2009) ("The fact that Defendant did not ask to examine the Windstar before Plaintiffs commenced litigation does not erode Plaintiffs' duty to preserve the Windstar as material evidence in their lawsuit and/or to give notice to Defendant that they were planning to trade in the Windstar."). Thus, Defendant's alleged disinterest in inspecting the parts more than two years before Plaintiff filed suit did not relieve Plaintiff of its duty to preserve relevant evidence.

Plaintiff also contends that it "recycled" the parts in the normal course of business and therefore cannot have spoliated evidence. (*See* Dkt. No. 38 at 7–8; *see also* Dkt. No. 35 at 6) (Spurgeon declaration stating that it is Plaintiff's "standard procedure to recycle all scrap metal for several reasons," including lack of storage space and environmental regulatory requirements).

But, as noted by Plaintiff, a "party does not engage in spoliation when, *without notice of the evidence's potential relevance*, it destroys the evidence according to its policy or in the normal course of business." (Dkt. No. 38 at 7) (emphasis added) (quoting *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009)); *see also United States v. Kitsap Physicians Servs.*, 314 F.3d 995, 1001 (9th Cir. 2002) (internal quotations omitted) ("Defendants engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed.'"). As discussed above, Plaintiff should have reasonably known that the pumps and motors were relevant to any future claim for damages against Defendant as early as 2016. Thus, even taking as true that Plaintiff had a "standard procedure" of recycling and had to dispose of items pursuant to regulatory requirements, Plaintiff was not excused from its obligation to preserve relevant evidence. *See $40,955.00 in U.S. Currency*, 554 F.3d at 758.[5]

      In sum, Plaintiff had control over the affected pumps and motors and was under a duty to preserve them when Plaintiff sent them to be scrapped. And Plaintiff sent the pumps and motors to be scrapped with, at least, conscious disregard of its discovery obligations. And finally, the pumps and motors are unquestionably relevant to the parties' claims and defense in this case. Therefore, the Court FINDS that Plaintiff spoliated relevant evidence when it sent the pumps and motors to be scrapped. *See Apple Inc.*, 888 F. Supp. 2d at 989.

        2. *Appropriate Sanction*

      Having found that Plaintiff spoliated relevant evidence, the Court must determine an appropriate sanction to impose. When spoliation has occurred, the district court may impose a variety of sanctions, including:

> (1) exclusion of evidence, (2) admitting evidence of the circumstances of the destruction or spoliation, (3) instructing the jury that it may infer that the lost

---

[5] The Court notes that neither Plaintiff's briefing nor Spurgeon's declaration establish why Plaintiff was precluded from storing the affected pumps and motors somewhere other than Plaintiff's grooming shop. (*See* Dkt. Nos. 35 at 6, 38 at 7–8.)

> evidence would have been unfavorable to the party accused of destroying it, or (4) entering judgment against the responsible party, either in the form of dismissal or default judgment.

*Pettit v. Smith*, 45 F. Supp. 3d 1099, 1105 (D. Ariz. 2014). A court may dismiss a case if "the conduct to be sanctioned [is] due to willfulness, fault, or bad faith." *Anheuser-Busch, Inc. v. Nat'l Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). "A party's destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were *potentially* relevant to the litigation before they were destroyed.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (quoting *Kitsap Physicians Servs.*, 314 F.3d at 1001). Because dismissal is a "harsh sanction," the court should consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id*. (quoting *Anheuser-Busch*, 69 F.3d at 348). While the court need not make explicit findings as to each factor, "a finding of 'willfulness, fault, or bad faith'" and consideration of "'less severe alternatives' than outright dismissal" are required. *Id*. (quoting *Anheuser-Busch*, 69 F.3d at 348; *Wiltec Guam, Inc. v. Kahaluu Constr. Co.*, 857 F.2d 600, 604 (9th Cir. 1988)).

As discussed above, Plaintiff was on notice as early as 2016 that the affected pumps and motors were relevant to any future claim for damages against Defendant. *See supra* section II.A.1; (Dkt. No. 30 at 110–11.) And, despite this early notice and after retaining the parts for over two years, Plaintiff sent the parts to be scrapped while its claim with Defendant's insurance company remained pending and shortly before filing its complaint in this action. (*See* Dkt. Nos. 1 at 8; 30 at 18–19, 26, 33–34.) Thus, Plaintiff's decision to send the affected pumps and motors to be scrapped constituted willful spoliation sufficient to support dismissal. *See Leon*, 464 F.3d at 959.

The prejudice suffered by Defendant because of Plaintiff's willful spoliation of the affected pumps and motors is difficult to overstate. Plaintiff's claims and asserted damages

require a finding that All-Trans did not conform to Defendant's alleged representations and that All-Trans caused the damage to the pumps and motors. (*See* Dkt. No. 25 at 3–4.) When Plaintiff spoliated the pumps and motors, it severely prejudiced Defendant's ability to defend itself: Defendant has not been able to examine the parts since this litigation commenced and its expert is unable to render a conclusive opinion as to the source of damage. (*See* Dkt. No. 29 at 53) ("The only physical evidence that Exponent has received and inspected suggested that there was no indication of damage from use of All Trans oil. However, SLI's spoliation of the subject evidence (in violation of ASTM standards) prevented a thorough analysis to determine the actual cause of the alleged failures and to fully evaluate SLI's allegations."). Absent an opportunity to inspect the affected parts, Defendant cannot meaningfully oppose Plaintiff's claims in any future trial. *See Leon*, 464 F.3d at 959 ("The prejudice inquiry looks at whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case.") (internal quotations and alterations omitted); *Erlandson*, 2009 WL 3672898, slip op. at 6 ("Plaintiffs here have . . . denied Defendant access to the only evidence from which Defendant can adequately investigate Plaintiff's claims and develop its defenses."). The partial and unidentified pump Plaintiff provided to Defendant cannot cure this substantial prejudice. *See State Farm Fire & Cas. Co. v. Broan Mfg. Co.*, 523 F. Supp. 2d 992, 997 (D. Ariz. 2007) (quoting *Anheuser-Busch*, 69 F.3d at 353–54) ("Although Defendant's expert was able to create a detailed report based on the evidence preserved from the fire scene, the spoliation in this case forces Defendant to 'rely on incomplete and spotty evidence.'").

No sanction less than dismissal would adequately cure the substantial prejudice suffered by Defendant. Excluding additional evidence or admitting evidence of the circumstances of Plaintiff's spoliation would not address the prejudice to Defendant, which flows from Defendant's inability to examine critical evidence and thereby defend itself. *See Petit*, 45 F. Supp. 3d at 1105. But the effect of an adverse jury instruction best illustrates why no lesser sanction is appropriate. If the jury were instructed that Plaintiff was on notice that it had an

ORDER
C19-0062-JCC
PAGE - 11

obligation to preserve the affected parts, that Plaintiff sent the parts to be scrapped before Defendant inspected them, that the parts were relevant to Defendant's defenses, and that an inspection of the parts would have corroborated Defendant's position that All-Trans conformed to Defendant's representations and did not damage the snowcats, then any need for a trial would be obviated: the jury could not find for Plaintiff on any of Plaintiff's claims. *See id.*; (Dkt. No. 25 at 3–4.) Thus, the substantial prejudice suffered by Defendant and the ineffectiveness of lesser sanctions support dismissal of Plaintiff's claims. *See Erlandson*, 2009 WL 3672898, slip op. at 6–7.

The public's interest in the expeditious resolution of litigation and the Court's need to control its docket also support dismissal of Plaintiff's claims because Plaintiff's spoliation of the affected parts destroyed the factual predicate of this case and has required the parties to litigate the issue of spoliation. *See Leon*, 464 F.3d at 958 n.5 (finding that first two *Anheuser-Busch* factors were supported when spoliation "obscur[ed] the factual predicate of the case and consum[ed] months of sanction-related litigation"). And while public policy rightly favors disposing of cases on their merits, Plaintiff's spoliation of the critical evidence in this case has rendered a merits determination of Plaintiff's claims impossible. *See id.* at 958.

In sum, the factors the Court should consider under Ninth Circuit caselaw before imposing dismissal as a sanction for spoliation weigh in favor of dismissing Plaintiff's claims in this case, with particular emphasis on the substantial prejudice suffered by Defendant and the inability of less severe sanctions to adequately address that prejudice. *See Leon*, 464 F.3d at 958; *Anheuser-Busch*, 69 F.3d at 348.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment and for sanctions (Dkt. No. 28) is GRANTED. Plaintiff's claims are DISMISSED as a sanction for its spoliation of relevant evidence. Defendant's motion to dismiss (Dkt. No. 31) and Plaintiff's motion for leave to file an opposition to Defendant's motion to dismiss (Dkt. No. 73) are DENIED as moot.

1    DATED this 27th day of March 2020.

John C. Coughenour
UNITED STATES DISTRICT JUDGE